[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-10922

_____

CSX TRANSPORTATION, INC.,

Plaintiff-Appellant,

*versus*

GENERAL MILLS, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:14-cv-00201-TWT

_____

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR, Circuit Judge, and PROCTOR,* District Judge.

JILL PRYOR, Circuit Judge:

CSX Transportation, Inc. is a freight railroad company that provides rail transportation services. General Mills, Inc., a food company, operates a cereal processing plant in Georgia near one of CSX's rail lines. A small connecting railroad known as a "sidetrack" connects CSX's main rail line to General Mills's plant, allowing General Mills to receive materials, ingredients, and equipment at its plant and to send its cereal away for distribution. A contract between CSX and General Mills governs the use of the sidetrack.

To make a very long story short, a General Mills employee suffered severe injuries while working on the sidetrack and then sued CSX for negligence. After a jury found CSX liable, the employee recovered a large settlement from CSX. CSX then sought to recover the settlement amount, as well as the expenses it incurred in defending the negligence suit, from General Mills. In this lawsuit, CSX sued General Mills for breach of contract, claiming that under the parties' agreement, General Mills was required to indemnify CSX—regardless of whether CSX alone was responsible for the employee's injury or CSX and General Mills were jointly responsible. The district court dismissed one of CSX's breach-of-contract claims and granted General Mills summary judgment on the other.

---

* Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

On appeal, CSX challenges both the district court's rulings. We agree with the district court that under the parties' agreement, General Mills was not required to indemnify CSX if CSX was solely negligent. But we disagree with the district court that the Georgia-law doctrine of vouchment barred CSX from litigating the issue of General Mills's negligence. If it turns out that General Mills was at least partially at fault for the injury, then under the contract General Mills must indemnify CSX for at least a portion of the settlement and related expenses. We thus affirm in part, reverse in part, and remand.

## I.    BACKGROUND

We begin by reviewing the provisions in the contract between CSX and General Mills governing the sidetrack that connects the CSX rail line with the General Mills cereal plant. We then describe how a General Mills employee was injured on the sidetrack, sued CSX, and secured a substantial settlement. We then turn to CSX's efforts to hold General Mills liable for the settlement and expenses CSX incurred in the underlying litigation.

## A.    The Sidetrack Agreement

CSX and General Mills signed a contract to build the sidetrack in 1989 (the "Sidetrack Agreement"). They agreed that a physical railroad would be constructed and that General Mills would have the option to conduct its own "switching" on that sidetrack—that is, "moving railcars that have been previously delivered by a train or assembling railcars in the proper order so that they can be coupled to a locomotive and pulled out of [the General Mills]

facility." Doc. 63 at 3–4.[1] To switch railcars, an operator uses a "trackmobile," a type of mobile railcar mover used to move railcars across short distances.

Relevant to this appeal, two contractual provisions addressed indemnification between the parties for losses related to use of the sidetrack. First, in Section 11 the parties agreed that "[e]xcept as otherwise provided" in the contract, for claims arising out of "use . . . of the Sidetrack," the parties would "jointly defend and bear equally" losses due to "joint or concurring negligence," but each party would "hold the other party harmless" for any losses due to "the indemnifying party's . . . sole negligence." Doc. 63-1 at 5–6. Section 11 carved out circumstances in which the default rule—that the parties would jointly defend and bear equally any losses—would not apply. The carved-out circumstances do not exist here.[2]

---

[1] "Doc." numbers refer to the district court's docket entries.

[2] Under the carveout, General Mills is "solely responsible" for the following losses: (1) "the failure of [General Mills] to properly maintain its segment of the Sidetrack"; (2) "the construction, alteration[,] or removal of the Sidetrack by [General Mills]"; (3) the presence of a restricted clearance on [General Mills's] Segment"; (4) "any personal injuries (including death) or property damage (real or personal) sustained . . . as the result of any road crossing collision on [General Mills's] Segment"; and (5) "the explosion, spillage[,] and/or presence of Hazardous Materials on [General Mills's] properties, facility or on [General Mills's] Segment . . . when such Losses would not have occurred but for the dangerous nature of the Hazardous Materials." Doc. 63-1 at 6.

Second, Section 15 gave General Mills the option to conduct its own switching operations on the sidetrack. Section 15 provided that if General Mills exercised the option to perform its own switching, it would "assume[] *all* risk of loss, damage, cost, liability, judgment[,] and expense, (including attorneys' fees) in connection with *any* personal injury" sustained or incurred by "employees of either [General Mills] or [CSX] or third persons . . . in connection with, or arising from or growing out of, the operation of" General Mills's switching operations. *Id.* at 7 (emphasis in original).

For over a decade, General Mills chose not to conduct its own switching operations. Later, however, General Mills exercised its contractual option to conduct its own switching. It bought a trackmobile from a company that also provided training to General Mills's employees on how to use the trackmobile to conduct switching operations. As part of the training, employees were taught to use "chocks"—wedges placed on either side of a railcar's wheels to inhibit movement—and to employ the handbrakes on railcars when operating the trackmobile.

## B.    The Negligence Lawsuit

A couple of years later, Doug Burchfield and Rodney Turk, two General Mills employees, were using the trackmobile to move AEX 7136, a railcar stocked with wheat that CSX had delivered to the juncture between the main rail line and General Mills's sidetrack. After uncoupling AEX 7136 from the trackmobile and parking it, Turk thought he saw the railcar move. He asked Burchfield if he had set the handbrake. Burchfield assured Turk that he had set

it. The pair left the railcar sitting on the track and moved away to switch an empty railcar that was located just downhill from AEX 7136. While Burchfield stood near the trackmobile, AEX 7136 sprung loose, rolled down the slope, and crashed into the track-mobile, which in turn ran into the empty railcar. All three vehicles derailed and ran over Burchfield. He suffered extensive injuries leading to the amputation of both his lower legs.

Burchfield filed a personal injury suit in the Northern District of Georgia against CSX and the company that owned AEX 7136.[3] In his complaint, Burchfield alleged that CSX negligently delivered AEX 7136 to General Mills with a faulty handbrake, which caused the accident.

CSX sent General Mills a letter notifying it of Burchfield's lawsuit. CSX demanded that General Mills provide a defense. General Mills refused to defend CSX.

In the *Burchfield* litigation, CSX sought to attribute fault to General Mills for Burchfield's injury. CSX argued that General

---

[3] Because Burchfield received workers' compensation for his injuries, Georgia law precluded him from suing General Mills, his employer, for damages. *See* O.C.G.A. § 34-9-11(a) ("The rights and the remedies granted to an employee by this chapter shall exclude and be in the place of all other rights and remedies of such employee . . . on account of such injury . . . ."); *see also Brooks-Powers v. Metro. Atlanta Rapid Transit Auth.*, 579 S.E.2d 802, 804 (Ga. Ct. App. 2003) (stating that "[w]here the [Georgia Workers' Compensation] Act is applicable, its provisions are the exclusive remedy for the employee against the employer" (internal quotation marks omitted)). And the company that owned the railcar settled with Burchfield, leaving CSX as the sole defendant.

Mills failed to train and supervise Burchfield and Turk and that because of General Mills's negligence AEX 7136 was left without chocks blocking the wheels or handbraking before the accident. CSX requested that the district court use a verdict form that would allow the jury to allocate fault to non-party General Mills.

Burchfield moved for summary judgment on the issue of General Mills's liability. The district court granted the summary judgment motion, concluding that CSX failed to raise the affirmative defense of General Mills's fault in a timely manner and also failed to introduce expert testimony regarding the standard of care. *See Burchfield v. CSX Transp. Inc*, No. 1:07-cv-1263, 2009 WL 1405144, at ★9–11 (N.D. Ga. May 15, 2009).

Burchfield's negligence claim against CSX went to trial. The jury found in CSX's favor, and Burchfield appealed. *Burchfield v. CSX Transp. Inc.*, 636 F.3d 1330, 1333 (11th Cir. 2011). We reversed the judgment and remanded for a new trial on the ground that the district court erred in admitting certain evidence. *Id*. at 1338.

The case proceeded to a second trial. This time, the jury found CSX liable and awarded Burchfield more than $20 million. Asked to allocate fault between Burchfield and CSX, the jury found that Burchfield was zero percent negligent and CSX was 100 percent negligent. The jury was not asked about General Mills. CSX appealed. While CSX's appeal was pending, CSX and Burchfield settled for $16 million.

Following the settlement, CSX demanded indemnification from General Mills. CSX asserted that under the Sidetrack

Agreement General Mills owed it the full amount of the settlement payment, as well as the attorney's fees and costs CSX incurred in defending the case. According to CSX, General Mills was required to indemnify it under both Section 11 and Section 15 of the Sidetrack Agreement.

General Mills again refused CSX's demand, contending that there was "no basis—contractual or otherwise—for the demand that General Mills indemnify CSX for its own negligence and resulting damages." Doc. 63-8 at 2. Addressing Section 11, General Mills maintained that it was required to indemnify CSX only if General Mills was also negligent. In General Mills's view, because the jury in the *Burchfield* litigation concluded that CSX was 100 percent at fault, "meaning 100% individually at fault as compared to anyone else in the world who could have been potentially at fault for Mr. Burchfield's injuries," Section 11 did not support CSX's request. *Id.* at 3.

As to Section 15, General Mills contended that it owed no duty to indemnify CSX for the same reason: CSX's negligence was the sole cause of Burchfield's injury. General Mills asserted that Section 15 did not require it to indemnify CSX for losses that arose solely from CSX's own negligence.

## C.    CSX's Breach-of-Contract Lawsuit

CSX sued General Mills for breach of contract, seeking indemnification for the settlement with Burchfield. As relevant on appeal, CSX alleged that under Section 15 of the Sidetrack Agreement General Mills was required to assume all costs for injuries

arising from General Mills's switching operations "without regard to who ultimately was determined to be at fault." Doc. 1 at 18.

General Mills moved to dismiss the complaint for failure to state a claim, and the district court granted the motion. The court explained that under Georgia law, a party is contractually obligated to indemnify another party for losses when the first party is not negligent only if the parties' contract meets the "heightened specificity requirement" of "expressly, plainly, clearly, and unequivocally" providing for indemnification under such circumstances. Doc. 36 at 8 (emphasis omitted). The court determined that Section 15 did not meet that standard and thus General Mills was not required to indemnify CSX when CSX alone was negligent. The district court thus concluded that the Sidetrack Agreement did not require General Mills to indemnify CSX for the *Burchfield* settlement or its litigation costs.

CSX moved for reconsideration of the district court's order dismissing the complaint. It argued that the dismissal relied on the "unspoken premise" that CSX could not litigate General Mills's fault because federal collateral estoppel principles precluded it from doing so. Doc. 38 at 5. In CSX's view, the district court committed legal error by applying federal collateral estoppel law when it should have applied Georgia law. Georgia's collateral estoppel rule would have allowed CSX to litigate General Mills's negligence.[4]

---

[4] Under Georgia's collateral estoppel rule, CSX would be precluded from raising arguments about General Mills's negligence in the indemnity suit only if

The district court denied the motion, stating that CSX "failed to show that the Court committed a clear error of law." Doc. 41 at 3.

CSX appealed the district court's dismissal of its complaint, and we reversed. *CSX Transp., Inc. v. General Mills, Inc.*, 846 F.3d 1333 (11th Cir. 2017). We focused on the district court's conclusion that federal collateral-estoppel principles precluded CSX from litigating General Mills's fault in the indemnification action. *Id.* at 1335. We agreed with CSX that the district court should have applied Georgia's collateral estoppel rule. *Id.* at 1340. But we remanded for the district court to determine whether, under that rule, General Mills and Burchfield were "identical parties" so that the *Burchfield* judgment was binding on CSX in the indemnity suit. *Id.* (internal quotation marks omitted). We expressly declined to decide "whether the Sidetrack Agreement requires indemnification assuming CSX was solely at fault." *Id.*

On remand, CSX filed an amended complaint alleging three counts. Count One again alleged that Section 15 of the Sidetrack Agreement required General Mills to indemnify CSX "without

---

the *Burchfield* lawsuit involved "the same parties or their privies." *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1264 (11th Cir. 2011) (internal quotation marks omitted); *see Camden Cnty. v. Sweatt*, 883 S.E.2d 827, 833 (Ga. 2023) (explaining that collateral estoppel precludes "re-adjudication of an issue that has previously been litigated . . . in another action between the same parties or their privies (emphasis omitted) (internal quotation marks omitted)). By contrast, under the federal rule, a non-party to a previous action (General Mills) may assert collateral estoppel offensively to preclude a party to the previous action (CSX) from litigating issues decided in the previous action. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 331 (1979).

regard to who ultimately might be determined to be at fault." Doc. 63 at 16 (emphasis omitted). Count Two alleged, in the alternative, that Section 15 required General Mills to indemnify CSX because General Mills bore "at least some fault in causing Mr. Burchfield's injuries." *Id.* at 19 (emphasis omitted). Count Three alleged, also in the alternative, that if "Burchfield's injuries did not arise from or grow out of use of the trackmobile" and CSX and General Mills were jointly or concurrently negligent, Section 11 required General Mills to indemnify CSX for 50 percent of CSX's loss. *Id.* at 21.

General Mills again moved to dismiss CSX's claims. The district court dismissed Count One for the same reason it had dismissed the Section 15 claim in its earlier order: Section 15's language was too broad and vague to require General Mills to indemnify CSX without regard to fault. But the court did not dismiss Counts Two or Three. Applying Georgia's collateral estoppel rule, the court concluded that CSX was not barred from arguing that General Mills was partially at fault for Burchfield's injuries. Therefore, the claims in Counts Two and Three, which required CSX to show General Mills was at least partially at fault, survived.

After discovery, the parties filed cross-motions for summary judgment. In its summary judgment motion, General Mills explained that for CSX to prevail on Counts Two or Three, it had to show that General Mills's negligence caused or contributed to Burchfield's injuries. Again, General Mills maintained that CSX was precluded from litigating General Mills's negligence. This time, it argued that because CSX had vouched General Mills into the

*Burchfield* litigation, CSX was bound by the *Burchfield* judgment, which General Mills said determined that "CSX was 100% at fault . . . Burchfield was 0% at fault . . . and General Mills was not negligent." Doc. 188 at 17. The district court agreed, remarking that "in the vouchment doctrine, [General Mills] appears to have finally hit on a viable preclusion argument." Doc. 258 at 7. The district court entered judgment against CSX.

CSX now appeals the district court's orders granting General Mills's motion to dismiss Count One and its motion for summary judgment on Counts Two and Three.

## II.    STANDARD OF REVIEW

We review *de novo* an order granting a motion to dismiss for failure to state a claim. *See Hoever v. Marks*, 993 F.3d 1353, 1357 (11th Cir. 2021) (en banc). We also review *de novo* a district court's grant of summary judgment. *See State Farm Mut. Auto. Ins. Co. v. Spangler*, 64 F.4th 1173, 1178 (11th Cir. 2023). In addition, the interpretation of a contract or statute is a question of law that we review *de novo*. *See Hoever*, 993 F.3d at 1357 (statute); *Southland Distribs. Mktg. Co. v. S&P Co.*, 296 F.3d 1050, 1053 (11th Cir. 2002) (contract).

## III.    DISCUSSION

CSX raises two theories on appeal for why General Mills is required to indemnify it. First, CSX argues that even if it was solely at fault for Burchfield's injuries, Section 15 of the Sidetrack Agreement required General Mills to indemnify it. Second, it argues that that General Mills owed it a duty to defend because a reasonable jury could find that General Mills was at least partially at fault in

causing Burchfield's injuries. As to this second theory, CSX argues that the district court erred in concluding that Georgia's vouchment statute precluded it from establishing that General Mills was at least partially at fault for Burchfield's injuries. We address the two theories in turn.

## A.    The Sidetrack Agreement does not require General Mills to indemnify CSX when CSX is solely at fault.

CSX argues the district court erred in dismissing Count One, its indemnification claim under Section 15. It reasons that the Sidetrack Agreement unambiguously required General Mills to indemnify CSX, even for CSX's sole negligence, so the district court erred in refusing to enforce the provision. We disagree.

Under Georgia law,[5] a contract requires indemnification for an indemnitee's sole negligence only when it explicitly says that the indemnitor must pay even if he is not negligent. *See Park Pride Atlanta, Inc. v. City of Atlanta*, 541 S.E.2d 687, 689 (Ga. Ct. App. 2000). In *Park Pride*, a non-profit organization agreed to hold a city harmless "from any and all claims . . . of any kind . . . or nature . . . for any activity sponsored by" the organization. *Id.* (internal quotation marks omitted) At a park clean-up event sponsored by the organization, a city dump truck rolled backward crushing a woman, who died from her injuries, and injuring her husband. *Id.* at 688. The husband sued the city, bringing claims arising out of his wife's

---

[5] The parties agree that Georgia law governs CSX's claims.

death and his injuries. *Id*. After the city settled the tort litigation, it sued the organization seeking indemnification. *Id*.

The Georgia Court of Appeals considered whether the indemnification agreement required the organization to indemnify the city for the city's own negligence. *Id*. at 689. The court began with the principle that "[p]ublic policy is reluctant to cast the burden for negligent actions upon those who are not actually at fault" because "[p]ublic policy seeks to encourage people to exercise due care in their activities for fear of liability, rather than to act carelessly cloaked with the knowledge that an indemnity contract will relieve such indifference." *Id*. Based on this public policy concern, it explained that a party who was not negligent generally would not be required to indemnify a party who was negligent unless a contract "explicitly and expressly" required indemnification. *Id*. The court emphasized that "[t]he words of a contract of indemnification . . . must be construed strictly against the indemnitee" with "every presumption" against indemnification. *Id*. (internal quotation marks omitted).

Relying on this standard, the Georgia Court of Appeals concluded that the parties' agreement did not require the organization to indemnify the city. Although the indemnification provision at first blush "appear[ed] to indemnify the [c]ity 'against any and all claims,'" the provision was "bereft of any express or explicit statement about coverage for the [c]ity's own negligent acts." *Id*. Because the indemnity provision "failed to expressly, plainly, clearly, and unequivocally state that [the organization] would indemnify

the [c]ity from the [c]ity's own negligence," the organization had no obligation to indemnify the city for the settlement in the underlying litigation. *Id.*; *see also Viad Corp. v. U.S. Steel Corp.*, 808 S.E.2d 58, 60, 63 (Ga. Ct. App. 2017) (holding that an agreement to indemnify for "[a]ll debts, liabilities, and obligations" was not "sufficient" to require indemnification for a party's sole negligence because the agreement did not explicitly mention the "negligence" of the party seeking indemnification (internal quotation marks omitted)); *S. Ry. Co. v. Union Camp Corp.*, 353 S.E.2d 519, 520–21 (Ga. Ct. App. 1987) (reaching same conclusion for agreement to indemnify for "all loss, damage, liability or expense" (internal quotation marks omitted)).

With this guidance, we return to the Sidetrack Agreement. Section 15 set forth General Mills's option to conduct its own switching operations and the risk of liability it accepted in exchange. If General Mills chose to perform its own switching, it "assume[d] *all* risk of loss, damage, cost, liability, judgment[,] and expense . . . in connection with *any* personal injury. . . arising from . . . the operation of [General Mills's] trackmobile or locomotive power upon [the] Sidetrack." Doc. 63-1 at 7 (emphasis in original).

Applying Georgia law, we conclude that this provision did not require General Mills to indemnify CSX for CSX's sole negligence. Nothing in Section 15 "explicitly and expressly" stated that indemnification was required if General Mills was not at fault. *Park Pride*, 541 S.E.2d at 689. To be sure, under Section 15's broad terms, General Mills "assume[d] all risk of loss." Doc. 63-1 at 7 (emphasis omitted). But as *Park Pride* made clear, such language does not

"expressly, plainly, clearly, and unequivocally" state that an indemnitor must cover losses that result from the indemnitee's own negligence. *Id.* at 689.

CSX's counterarguments are unavailing. It contends that Section 15 makes sense only if General Mills was required to indemnify it regardless of fault. In its view, the Sidetrack Agreement allowed General Mills to take over its switching operations—meaning that CSX would give up "both control over the risk and the revenue from performing the switching function for General Mills"—in exchange for General Mills's agreement to "assume *all* risk of liability for *any* personal injury to any person." Appellant's Br. at 25 (alterations adopted). At first blush, CSX's quid pro quo argument is compelling: CSX gave up control over—including the potential ability to prevent accidents—and revenue from switching activity on the sidetrack, and in return General Mills accepted all liability regardless of who was at fault. But the Georgia Court of Appeals concluded that a similar indemnification provision—in which the indemnitor agreed to assume liability for "all loss" that the indemnitee incurred "because of any injury to or death of any person or loss of or injury or damage to any property"—did not "expressly state[] that the negligence of the indemnitee is covered" and thus did not require indemnification for the indemnitee's own negligence. *See S. Ry. Co.*, 353 S.E.2d at 520–21. Section 15's language is simply not explicit enough to require General Mills to indemnify CSX for CSX's own negligence, particularly given that we must construe the contract "strictly against" CSX as the indemnitee. *Park Pride*, 541 S.E.2d at 689. Here, construing the contract

strictly against CSX means that General Mills does not have to indemnify unless it was at least partially liable for Burchfield's accident.

Georgia's rules of contract construction require that we interpret Section 15 in the context of the entire agreement. *See Peachtree on Peachtree Invs., Ltd. v. Reed Drug Co.*, 308 S.E.2d 825, 828 (Ga. 1983). But our reading does not conflict with the rest of the contract. Section 11(A) generally provided that each party would "hold the other party harmless" for losses arising from "the indemnifying party's . . . sole negligence." Doc. 63-1 at 6. Section 11(C) carved out five specific exceptions in which General Mills agreed to indemnify CSX "irrespective of the sole . . . negligence of [CSX]." *Id.* These carveouts described the only circumstances in which General Mills was required to indemnify CSX if CSX was solely negligent. And none of the carveouts included incidents arising out of General Mills' switching operations discussed in Section 15.

Because Section 15 did not expressly, explicitly, and unequivocally require General Mills to indemnify CSX for CSX's sole negligence, the district court did not err in dismissing CSX's claim that General Mills was liable under Section 15 even if CSX alone was negligent. We thus affirm the district court's dismissal of Count One.

**B.    The vouchment doctrine does not bar CSX from establishing that General Mills was at least partially at fault and thus liable under the Sidetrack Agreement.**

CSX's other argument on appeal arises from its alternative theory that the Sidetrack Agreement required General Mills to indemnify CSX because General Mills's negligence contributed to Burchfield's injuries. CSX argues that the district court erred in granting General Mills's motion for summary judgment because the court misapplied Georgia's vouchment law when it found that CSX was bound by the *Burchfield* jury's verdict and thus could not prove that General Mills was partially at fault.

We begin by introducing Georgia's vouchment statute. We then explain why we agree with CSX that the vouchment statute binds only General Mills to the *Burchfield* judgment.

### 1.    Vouchment under Georgia law

Georgia's vouchment doctrine addresses when a non-party may be bound by the judgment in a lawsuit. The term "vouch" means "to call into court to warrant and defend." *Loeb v. May*, 198 S.E. 785, 786 (Ga. 1938) (internal quotation marks omitted). A rudimentary hypothetical demonstrates how vouchment works: A plaintiff sues a defendant for an injury. But the defendant believes that a non-party is liable for the plaintiff's injury instead. Vouchment empowers the defendant as a "voucher" to bind the non-party as the "vouchee" to the judgment in the first lawsuit about the plaintiff's right to recover.

To use this tool, the defendant merely needs to notify the non-party about the action against the defendant. *See, e.g., Chicago v. Robbins*, 67 U.S. (2 Black) 418, 423 (1862); *W. & Atl. R.R. Co. v. City of Atlanta*, 74 Ga. 774, 777 (1885). Importantly, vouchment *does not* make the non-party a party to the lawsuit. *See* 13 *Ga. Jurisprudence* § 10:27 (Sept. 2023 update). Instead, vouchment occurs outside of court and is subject to few procedural rules. It requires nothing more of the voucher than giving notice of the lawsuit to the vouchee, which can be done in a letter or even orally. *Id.*

In 1895, Georgia enacted a statute codifying the common-law doctrine of vouchment. The statute provides:

> Where a defendant may have a remedy over against another person and vouches him into court by giving notice of the pendency of the action, the judgment rendered therein shall be conclusive upon the person vouched, as to the amount and right of the plaintiff to recover.

O.C.G.A. § 9-10-13. The doctrine's primary purpose is judicial efficiency:

> [I]f the act of the vouchee is the real thing complained of, so that, if there is a recovery by the injured party against the voucher, he can turn right around and claim indemnity from the vouchee, then it is to the interest of the state that a multiplicity of suits should be avoided by requiring the vouchee to appear in the original suit and set up any defense which he has.

*Raleigh & G.R. Co. v. W. & A.R. Co.*, 65 S.E. 586, 588 (Ga. Ct. App. 1909). The idea is that the first lawsuit will conclusively determine the injured party's right to recover, limiting the scope of a later indemnification lawsuit to the sole question of "the relationships and liabilities between the party vouching and the person vouched." *McArthor v. Ogletree*, 61 S.E. 859, 860 (Ga. Ct. App. 1908). In this way, vouchment incentivizes the vouchee to support the voucher's defense against the plaintiff by raising affirmative defenses or introducing any relevant evidence in the first lawsuit. *See S. Ry. Co. v. Acme Fast Freight*, 19 S.E.2d 286, 287–88 (Ga. 1942). That said, the vouchee is not obligated to participate in the voucher's defense. *Id.* It may, as General Mills did, decline to defend. But it will be bound by the judgment in the underlying lawsuit. *See id.* With this background, we turn to the vouchment issue before us.

2.      **Application of Vouchment to the *Burchfield* Judgment**

The parties agree that CSX vouched General Mills into the *Burchfield* case and that General Mills refused to participate. In a traditional vouchment scenario, CSX would then be able to invoke the vouchment doctrine to bar General Mills from relitigating issues related to Burchfield's right to recover or the amount of his damages because those issues were already decided in the *Burchfield* case. But in this lawsuit, it is General Mills—the vouchee—who seeks to use vouchment to bar CSX from litigating issues that General Mills insists were decided against CSX in the *Burchfield* litigation. As a federal court addressing an issue of Georgia state law in this diversity action, we must defer to the Georgia courts' appellate

decisions on that issue.[6] But here, no Georgia court has ever considered whether an earlier judgment has preclusive effect on a voucher in an action against his vouchee. In the prior vouchment cases, the vouchee, not the voucher, sought to relitigate the earlier liability finding, so this question has not been decided. *See, e.g.*, *W. & Atl. R.R.*, 74 Ga. at 777. Thus, the question whether vouchment binds both parties or only the vouchee is one of first impression on which we have no state court guidance.

The district court determined that the *Burchfield* judgment decided the question of whether General Mills was liable for Burchfield's accident and that CSX was precluded from pursing indemnification based on General Mills's partial or complete fault for Burchfield's accident. CSX's claims for recovery under Counts Two and Three both depend on General Mills being at least partially at fault. So, by precluding CSX from attempting to show that General

---

[6] Because our jurisdiction in this case rests on diversity of citizenship, *see* 28 U.S.C. § 1332, we apply the substantive law of Georgia—the forum state, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). When a state's highest appellate court (in this case the Georgia Supreme Court) has addressed an issue of state law, we simply apply its holding. *See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1021 (11th Cir. 2014). But when we are confronted with a state-law issue of first impression, we must attempt to predict how the state's highest court would decide the issue. *See Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). Absent certainty from the state's highest court, we apply the decisions of the state's intermediate court—here, the Georgia Court of Appeals—unless there is "persuasive indication that the [Georgia Supreme Court] would rule otherwise." *CSX Transp., Inc. v. Trism Specialized Carriers, Inc.*, 182 F.3d 788, 791 (11th Cir. 1999).

Mills was negligent to support its claims, the district court eviscerated CSX's theory of recovery and inevitably concluded that CSX's alternative claims failed.

CSX argues that the district court misinterpreted the vouchment statute because vouchment binds only the vouchee (General Mills), not the voucher (CSX), to a judgment. We agree with CSX's reading of the vouchment statute.

In interpreting Georgia's vouchment statute, we look to Georgia's rules of statutory construction. *See Grange Mut. Cas. Co. v. Woodward*, 826 F.3d 1289, 1300 (11th Cir. 2016) (explaining that we "examine Georgia's canons of statutory construction to attempt to determine how Georgia courts would interpret a statute"). Under Georgia law, "if the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." *Deal v. Coleman*, 751 S.E.2d 337, 341 (Ga. 2013) (internal quotation marks omitted).

As a reminder, the vouchment statute provides that when a defendant in a lawsuit gives notice to another person and vouches her into the lawsuit, "the judgment rendered therein shall be conclusive *upon the person vouched*, as to the amount and right of the plaintiff to recover." O.C.G.A. § 9-10-13 (emphasis added). By its plain language, the statute addresses the preclusive effect of a judgment in an underlying action on the vouchee, not the voucher. And the title of the statute, "Effect of judgment *on party vouched* into court," is consistent with that language. *Id.* (emphasis added); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation*

*of Legal Texts* § 35, at 221 (2012) (recognizing that "title and headings are permissible indicators of meaning"); *Ne. Atlanta Bonding Co. v. State*, 707 S.E.2d 921, 926 n.5 (Ga. Ct. App. 2011) (explaining that statute's title may be considered when "ascertaining legislative intent"). As to the preclusive effect of the judgment on the vouching party, the statute is silent. *See* O.C.G.A. § 9-10-13.

This interpretation is also consistent with the canon of construction that "[a] statute will be construed to alter the common law only when that disposition is clear." Scalia & Garner, § 52, at 318; *see Boca Petroco, Inc. v. Petroleum Realty II, LLC*, 678 S.E.2d 330, 332–33 (Ga. 2009) (recognizing that a "common law rule survives [a] statute regarding same area of concern when [the] statute does not directly address certain elements of [the] common law rule"). Here, there are no clear signs that the statute altered the common law. Instead, the Georgia Supreme Court has repeatedly stated that the vouchment statute codified—and did not alter—the common-law doctrine of vouchment. *See, e.g.*, *Loeb*, 198 S.E. at 786; *McArthor*, 61 S.E. at 860. Therefore, we must interpret the statute in the light of its common-law history.

And we see nothing in the common law to suggest that vouchment precludes the voucher from litigating issues that may have been decided in earlier litigation between the injured party and the voucher. At the time Georgia enacted the vouchment statute, the key Georgia common-law decisions on vouchment were *Western & Atlantic Railroad*, 74 Ga. at 777, and *Faith v. City of Atlanta*, 78 Ga. 779 (1887). *See Loeb*, 198 S.E. at 786 (explaining that

Georgia's vouchment statute adopted the reasoning from these decisions). Neither case holds that vouchment precludes the voucher from relitigating issues that were decided in the underlying litigation.

We start with *Western & Atlantic Railroad*. In that case, a pedestrian who was injured at a railroad crossing sued a city for negligent maintenance of the crossing. 74 Ga. at 776. Although the city notified the railroad of the case and claimed that the railroad was liable, the railroad did not participate in the pedestrian's negligence action. *Id*. at 776–77. After the city was held liable in the negligence action, it sued the railroad. *Id*. at 776.

In the indemnification action, the railroad (which was the vouchee) sought to introduce evidence that the pedestrian was at fault. *Id*. at 777. The trial court excluded the evidence. The Georgia Supreme Court affirmed, explaining that "both the city and the railroad company were concluded" by the verdict in the negligence case "and should not be heard to say that [the pedestrian] . . . could have avoided the injuries which he received." *Id. at* 778. Although the Court's broad language, read in isolation, could suggest that both the city and railroad were bound by the judgment, the decision was addressing the effect that the judgment in the underlying negligence action had on the vouchee (the railroad), not the voucher (the city). The Georgia Supreme Court made no ruling about the vouchment's preclusive effect on the city because that issue was not before it. *Id*.

A few years later, the Georgia Supreme Court again addressed vouchment in *Faith*. In that case, a person injured on a city street sued a city for negligence. 4 S.E. at 3. The city believed that the plaintiff's injuries were caused by a property owner who had dug holes in the street and left the holes uncovered. *Id.* The city asked the property owner to appear and defend the suit. *Id.* The property owner refused. *Id.* After the plaintiff recovered against the city in the negligence action, the city sued the property owner seeking indemnification. *Id.* The city prevailed in the indemnification action, and the property owner appealed. *Id.*

On appeal, the Georgia Supreme Court addressed the issues the property owner (the vouchee) could raise in defending the indemnification action brought by the city (the voucher). Because "the judgment of the injured party against the city" was "conclusive" as to the right of the injured party to recover and the amount of his damages, the property owner could not raise these issues. *Id.* at 4. But he could raise other defenses including that "he was under no obligation to keep that portion of the streets in safe condition;" that "it was not through his [fault] that the injury happened;" and that if he and the city were both responsible, the city could not recover against him. *Id.* Although the Georgia Supreme Court stated broadly that the judgment was "conclusive between the city and [the property owner]," it did not address the vouchment's preclusive effect on the voucher because that question was not at issue. *Id.*

In these two foundational common-law vouchment cases, the Georgia Supreme Court held that the earlier judgment bound the vouchee. No more, no less. We agree with CSX that we are not bound by any "loose language," Appellant's Br. at 46, in which the Georgia Supreme Court commented on issues not before it in each case. *See Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case."); *State v. Dorsey*, 875 S.E.2d 900, 907 n.5 (Ga. Ct. App. 2022) ("Language that sounds like a holding—but actually exceeds the scope of the case's factual context—is not a holding no matter how much it sounds like one." (internal quotation marks omitted)). We thus conclude that the vouchment statute, consistent with Georgia common law, provides that the vouchee alone is bound from relitigating issues decided in the earlier litigation.

General Mills nevertheless argues that we should reject this interpretation of the vouchment statute because it allows a voucher to "unilaterally bind a vouchee to favorable findings and contest unfavorable ones," which provides an impermissible windfall to the voucher. Appellee's Br. at 24 (internal quotation marks omitted). This argument misunderstands vouchment's purpose.

"Vouchment is *a right granted to the voucher* under the statute, as is the binding effect of the judgment *against the vouchee*." *Hardee v. Allied Steel Bldgs., Inc.*, 356 S.E.2d 682, 684 (Ga. Ct. App. 1987) (emphasis added). In other words, *by design*, vouchment empowers the voucher, not the vouchee. Vouchment exists to incentivize the

vouchee to participate in the earlier action, defend his interests there, and reduce the burden of duplicative litigation on the judicial system. To accomplish this purpose, vouchment creates carrots and sticks for the vouchee. One stick is that a vouchee who is invited to participate in the earlier action and chooses not to do so is more likely to find herself bound to determinations she does not like precisely because she chose not to participate when invited to do so. General Mills's concern that vouchment, if it only binds the vouchee, tends to work *against* vouchees is simply a feature of the doctrine.[7]

Because the doctrine of vouchment does not preclude CSX from introducing evidence of General Mills's fault, CSX may be able to establish that General Mills was at least partially at fault for Burchfield's injuries and thus required under the Sidetrack Agreement to indemnify CSX for at least a portion of the settlement and expenses incurred in the *Burchfield* litigation. Accordingly, we reverse the district court's order granting summary judgment on Counts Two and Three.

---

[7] CSX argues in the alternative that the vouchment statute does not bar it from raising an issue about General Mills's fault because no issue regarding General Mills's negligence was decided in the *Burfield* litigation. Because we conclude that the vouchment statute does not preclude CSX (as voucher) from relitigating any issues against General Mills, we need not address this alternative argument.

## IV.    CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's dismissal of Count One, **REVERSE** the district court's entry of summary judgment on Counts Two and Three, and **REMAND** for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**